EXHIBIT F

**Research and Development Services Agreement** (the "Agreement") dated as of January 1, 2001 (the "Effective Date"), and reduced to writing on May 29, 2003, by and between Big Bang Technologies, Inc., a California corporation with an office at 1810 Old Oakland Road, Suite F, San Jose, California 95131 ("BBT") and e-Smart Technologies, Inc., a Nevada corporation with an office at 7225 Bermuda Road, Suite C, Las Vegas, Nevada 89119 (the "Company"). The Company and BBT are sometimes hereinafter individually referred to as a "Party" and collectively as the "Parties".

## WITNESSETH:

**WHEREAS**, the Company is a development stage entity engaged in the research and development of smart card technology and multi-application smart card solutions licensed from IVI Smart Technologies, Inc., a Delaware corporation and parent of the Company; and

**WHEREAS**, BBT is a privately owned company engaged in research and development and other specialized activities at its facilities in San Jose, California founded by the co-inventor of the Super Smart Card™ technology licensed to the Company; and

**WHEREAS**, the Company desires to engage BBT to provide research and development and other specialized services to the Company; and

**WHEREAS**, BBT has provided services to the Company since the Effective Date and is willing to continue to provide services to the Company on the terms and subject to the conditions set forth in this Agreement.

**NOW THEREFORE**, in consideration of the mutual covenants and promises contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby mutually acknowledged and accepted, the Parties hereby agree as follows:

1. **Engagement.** The Company hereby engages and retains BBT to perform and supply the Services (as that term is hereinafter defined in Section 3) on behalf of the Company; and BBT hereby accepts such appointment and agrees to perform and render the Services for and on behalf of the Company on the terms and subject to the conditions hereinafter set forth.

2. **Term and Termination.**

    A. This Agreement commences on the Effective Date and shall continue in full force and effect for a period of three years thereafter (the "Initial Term"), unless sooner terminated in accordance with the provisions hereof. After the Initial Term, this Agreement shall be automatically renewed for successive one year terms unless sooner terminated in accordance with the provisions hereof.

    B. This Agreement may be terminated as follows: (i) at any time upon written agreement between the Parties; or (ii) by the Company without cause upon giving not less than 90 days written notice to BBT, together with payment of any outstanding invoices and an amount equal to all fees, costs and expenses that shall, in the ordinary course of the Agreement, become due and payable by the Company during the period after delivery of such notice and the effective date of termination specified therein; (iii) by either Party at any

1

time without prior notice to the other Party if the other Party is in breach or default of any of its covenants, obligations or agreements hereunder, which breach or default continues for a period of ten days following written notification from the non-defaulting Party of such breach or default and such breach or default has not been fully and effectively remedied within such ten day period; (iv) by BBT at any time without prior notice to the Company if the Company becomes bankrupt or if a receiver or trustee is appointed to oversee the Company or its assets, or if the Company makes any proposal to its creditors or is otherwise insolvent or ceases carrying on business; or (v) on the first day of the second month following the month when the Company receives either permanent capital or an advance from a material contract.

C. Upon the effective date of termination or expiration of this Agreement for any reason without prejudice to any other rights which the Parties may have, and subject to the provisions of this Section: (i) BBT shall immediately discontinue the Services under this Agreement; (ii) BBT shall retain all payments made to it up to the effective date of termination as payment in full in respect of the Services in which such payments were made; and (iii) if and only if BBT is not the defaulting party, the Company shall pay to BBT the full amount of any outstanding invoices and expenses as well as such other expenses reasonably incurred by BBT arising from the termination.

3. **Description of the Services**. The Services shall be comprised as follows:

BBT hereby agrees to provide the Company with research and development services including overseeing and advising the Company with respect to all aspects of the development of the Super Smart Card™ technology including but not limited to the following: (i) a unique silicon-based, monolithic imaging device design in an executable package for the purpose of capturing fingerprint images from a statically placed finger(s); (ii) system layout schematic detailing CMOS drive and sense electronics definition, method of direct connection of CMOS metallurgy and MEMS metallurgy; (iii) definition of process flow and logistics; study of process compatibility between CMOS and MEMS fabs; (iv) modeling and simulation, re-layout of CMOS circuitry including complete system level modeling, re-definition of blocks and logic based on integrated system and verification of compatibility with MEMS process flow and final tape; (v) complete MEMS simulation, process flow testing and test structure definition, "short toop" definitions for process flow and material compatibility, mask set drawing definition, layout and verification, and final tape-out; (vi) trained professional staff necessary to carry out and conduct the Company's research and development activities; (vii) state of the art software and hardware testing facilities; and (viii) its advisory efforts to elevate and broaden the commercial and functional attributes of the Super Smart Card™ technology. The foregoing are collectively referred to as the "Services". The Services will be undertaken by BBT pursuant to the instructions of the Company from time to time provided to and agreed upon in writing by BBT.

It is understood and agreed that the Services may include advice and recommendations, but all decisions made in connection with the implementation of such advice and recommendations shall be the sole responsibility of, and shall be made and implemented by the Company's executives and its Board of Directors.

PDD000145

4. **Performance of the Services.**

The Company shall designate the personnel to perform the Services and shall set the parameters of the Services subject to BBT's approval, which approval shall not be unreasonably withheld. The Company may reasonably request removal of any employee or subcontractor of BBT and in such event, the Company shall provide notice thereof to BBT specifying in reasonable detail the basis of the request and in the event that the Company desires BBT to provide a replacement employee or subcontractor, BBT will use its best diligent efforts to provide a replacement as soon as reasonably practicable. The Company shall not unreasonably or unlawfully invoke its rights hereunder.

5. **Compensation.**

As compensation for the Services, the Company hereby agrees to make monthly payments to BBT as follows: $5,000 during 2001; $_____ during 2002; and $_____ during 2003. The Company also agrees to reimburse BBT for expenses incurred on the Company's behalf including extraordinary expenses such as airfare, out of town travel, litigation, etc. BBT hereby agrees to seek pre-approval from the Company for any such expenses in excess of $1,000. Any and all expenses will be invoiced by BBT to the Company as soon as practicable and will be due upon receipt.

6. **Representations Warranties, and Covenants.** In order to implement the operation of this Agreement, the Parties hereby jointly and severally represent, warrant, covenant, agree and consent as follows:

A. <u>Good Standing</u>. The Company and BBT are corporations duly formed, validly existing and in good standing under the laws of the States of Nevada and California, respectively, with full power and authority to conduct their respective business and to deliver and perform this Agreement in the time and manner contemplated;

B. <u>No Breach</u>. The execution, delivery and performance of this Agreement, in the time and manner herein specified, will not conflict with, result in a breach of, or constitute a default under any existing agreement, indenture, or other instrument to which either BBT or the Company is a party or by which either entity may be bound or affected;

C. <u>Authority</u>. Both BBT and the Company have full legal authority to enter into this Agreement and to perform the same in the time and manner contemplated;

D. <u>Approval</u>. This Agreement has been submitted to, ratified and approved by the respective Boards of Directors of BBT and the Company. Except for the foregoing, no action or proceeding on the part of BBT or the Company is necessary to authorize this Agreement and the transactions contemplated hereby. No filing with, authorization, consent or approval of any public body or authority is necessary for the consummation by BBT and the Company of the transaction contemplated by this Agreement; and

E. <u>The Company's Performance.</u> BBT represents and warrants that it has the professional expertise and experience to conduct the Services; and that the Services will be provided and performed in a professional and workmanlike manner.

3

7. **Confidential Data.** The following confidentiality provisions shall be applicable to this Agreement:

    A. The Company shall not divulge to others, any secret or confidential information, knowledge, or data concerning or pertaining to the business and affairs of BBT, obtained by it as a result of its employment, unless authorized, in writing, by BBT; and

    B. BBT shall not divulge to others, any secret or confidential information, knowledge, or data concerning or pertaining to the business and affairs of the Company, obtained by it as a result of its employment, unless authorized, in writing, by the Company; and

    C. Neither Party shall be required in the performance of its duties to divulge to the other Party or any officer, director, agent or employee of the other Party, any secret or confidential information, knowledge, or data concerning any other person, firm or entity (including, but not limited to, any such persons, firm or entity which may be competitor or potential competitor of one Party) which either Party may have or be able to obtain otherwise than as a result of the relationship established by this Agreement.

8. **Independent Contractor.** BBT is and shall be deemed to be, an independent contractor in the performance of its duties hereunder, any law of any jurisdiction to the contrary notwithstanding. BBT shall not, by reason of this Agreement or the performance of its duties hereunder, be, or be deemed to be, an employee, agent, partner, co-venturer or controlling person of the Company; and BBT shall have no power to enter into any agreement on behalf of or otherwise bind the Company. Except with respect to the compliance with the non-disclosure and secrecy provisions of this Agreement, BBT shall not have, or be deemed to have, any fiduciary obligations or duties to the Company and shall be free to pursue, conduct and carry on for its own account (or for the account of others) such activities, employments, ventures, businesses and other pursuits as BBT in its sole, absolute and unfettered discretion, may elect.

9. **Rights and Obligations Subsequent to Closing.** The representations, warranties, agreements, covenants and obligations of each Party contained herein are material, shall be deemed to have been relied upon by the other Party and shall survive execution of this Agreement for one year, regardless of any investigation, and shall not merge in the performance of any obligation by any Party hereto.

10. **Expenses.** Regardless of whether or not the transaction contemplated herein is consummated, each Party shall be responsible for its own share of all costs and expenses incurred in connection with this Agreement and transactions contemplated hereby.

11. **Amendment.** This Agreement may be amended by the Parties hereto by action taken by their respective Board of Directors at any time. This Agreement may not be amended except by an instrument in writing signed on behalf of each of the Parties hereto.

12. **Binding Effect.** All of the terms and provisions of this Agreement shall be binding upon and shall inure to the benefit of and be enforceable by and against the successors and assigns of the Parties hereto.

PDD000147

13. **Assignment.** This Agreement is binding upon and shall inure to the benefit of the Parties hereto and their respective successors and assigns. Notwithstanding the foregoing, neither party shall assign or transfer any rights or obligations hereunder, except that: (i) the Company may assign or transfer this Agreement to a successor corporation in the event of a merger, consolidation, or transfer or sale of all or substantially all of the assets of the Company, provided that no such further assignment shall relieve the Company from liability for the obligations assumed by it hereunder; and (ii) BBT may assign or transfer this Agreement to any firm which is an affiliate of BBT, provided that no such assignment shall relieve BBT from liability for its obligations hereunder.

14. **Entire Agreement.** Each of the Parties hereby covenants that this Agreement is intended to and does contain and embody herein all of the understandings and agreements, both written and oral, of the Parties hereby with respect to the subject matter of this Agreement, and that there exists no oral agreement or understanding, express or implied, whereby the absolute, final and unconditional character and nature of this Agreement shall be in any way invalidated, empowered or affected. There are no representations, warranties or covenants other than those set forth herein.

15. **Laws of the State of Nevada.** This Agreement shall be deemed to be made, executed and delivered in, governed by and interpreted under and construed in all respects in accordance with the laws of the State of Nevada, irrespective of the place of domicile or residence of any Party. In the event of controversy arising out of the interpretation, construction, performance or breach of this Agreement, the Parties hereby agree and consent to the jurisdiction and venue of the United States District Court for the District of Nevada and further agree and consent that personal service or process in any such action or proceeding outside of the State of Nevada and in the City of Las Vegas shall be tantamount to service in person or within the State of Nevada and in the City Las Vegas of and shall confer personal jurisdiction and venue on the said court.

16. **Originals.** This Agreement may be executed in counterparts, each of which so executed shall be deemed an original and constitute one of the same Agreement.

17. **Notices.** All notices that are required to be or may be sent pursuant to the provisions of this Agreement shall be sent by certified mail, return receipt requested, or by overnight package delivery service to the President or Chief Executive Officer of each of the Parties at the address appearing herein, and shall count from the date of mailing or the date following the date of the airbill.

18. **Modification and Waiver.** A modification or waiver of any of the provisions of this Agreement shall be effective only if made in writing and executed with the same formality of this Agreement. The failure of any Party to insist upon strict performance of any of the provisions of this Agreement shall not be construed as a waiver of any subsequent default of the same or similar nature or of any other nature or kind.

19. **Severability.** If any provision or any portion of any provision of this Agreement, or the application of such provision or any portion thereof to any person or circumstance shall be held invalid or unenforceable, the remaining portions of such provision and the remaining provisions of this Agreement or the application of such provision or portion of such provision

as is held invalid or unenforceable to persons or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby.

20. **Indemnification**. The following indemnification provisions shall be applicable to this Agreement:

A. Each Party hereby irrevocably agrees to indemnify and hold the other Party harmless from any and all liabilities and damages (including legal or other expenses incidental thereto), contingent, current, or inchoate to which that Party may become subject as a direct, indirect or incidental consequence of any action by the indemnifying Party or as a consequence of the failure of the indemnifying Party to act, whether pursuant to requirements of this Agreement or otherwise; and

B. In the event it becomes necessary to enforce this indemnity through an attorney, with or without litigation, the successful Party shall be entitled to recover from the indemnifying Party all costs incurred including reasonable attorneys' fees throughout any negotiations, trials or appeals, whether or not any suit is instituted.

21. **Taxes**. Each Party shall be responsible for all taxes which are based on its own net income. All sales, value added, and use taxes arising out of transactions occurring under this Agreement shall be the responsibility of the Party conducting such transaction and each Party hereby indemnifies and holds the other harmless from any and all claims relating to sales or use taxes collected or due by the Party conducting each of the transactions hereof; and

**IN WITNESS WHEREOF**, the Parties have caused this Agreement to be executed by the undersigned duly authorized respective officers, effective as of the day and year first set forth above.

**E-SMART TECHNOLOGIES, INC.**


By: _____
    Mary A. Grace, President


**BIG BANG TECHNOLOGIES, INC.**


By: _____
    Tamio Saito, President

PDD000149

**Amendment to Research and Development Services Agreement** (the "Amendment") made and entered into on April 19, 2004, by and between Big Bang Technologies, Inc., a California corporation with an office at 1810 Old Oakland Road, Suite F, San Jose, California 95131 ("BBT"), and e-Smart Technologies, Inc., a Nevada corporation with an office at 7225 Bermuda Road, Suite C, Las Vegas, Nevada 89119 (the "Company"). The Company and BBT are sometimes hereinafter individually referred to as a "Party" and collectively as the "Parties".

### WITNESSETH:

**WHEREAS**, the Company and ABG are the Parties to a Research and Development Services Agreement dated May 29, 2003 (the "Agreement"); and

**WHEREAS**, the Parties desire to amend the Agreement to include the terms and conditions set forth in this Amendment.

**NOW, THEREFORE**, in consideration of the foregoing recitals, and the other good and valuable consideration hereinafter set forth, the receipt and adequacy of which are hereby acknowledged and accepted, the Parties agree as follows:

1.  **Amendment to the Agreement.** The Parties hereby amend the Agreement as follows:

    A.  Paragraphs 3 and 5 of the Agreement are hereby deleted in their entirety and the following Paragraphs are hereby substituted in their place and stead:

    "3. <u>Description of the Services</u>. During the Term, BBT shall supply the personal services of Tamio Saito as the Company's Chief Technical Officer and certain other employees of BBT to oversee and advise the Company with respect to all aspects of the development of the Company's Super Smart Card™ technology including but not limited to the following: (i) a unique silicon-based, monolithic imaging device design in an executable package for the purpose of capturing fingerprint images from a statically placed finger(s); (ii) system layout schematic detailing CMOS drive and sense electronics definition, method of direct connection of CMOS metallurgy and MEMS metallurgy; (iii) definition of process flow and logistics; study of process compatibility between CMOS and MEMS fabs; (iv) modeling and simulation, re-layout of CMOS circuitry including complete system level modeling, re-definition of blocks and logic based on integrated system and verification of compatibility with MEMS process flow and final tape; (v) complete MEMS simulation, process flow testing and test structure definition, "short toop" definitions for process flow and material compatibility, mask set drawing definition, layout and verification, and final tape-out; (vi) trained professional staff necessary to carry out and conduct the Company's research and development activities; (vii) state of the art software and hardware testing facilities; and (viii) its advisory efforts to elevate and broaden the commercial and functional attributes of the Super Smart Card™ technology. The foregoing are collectively referred to as the "Services". The Services will be undertaken by BBT pursuant to the instructions of the Company from time to time provided to BBT.

1

5. <u>Compensation</u>. As compensation for the Services, the Company hereby agrees to pay to BBT a fee of $10,000 per month (the "Monthly Fee"). The Monthly Fee shall be payable on the 1st day of each month. Accordingly, the Monthly Fee shall commence on May 1, 2004. It is expressly agreed and understood that the Monthly Fee does not include extraordinary expenses such as airfare, out of town travel, litigation, etc. BBT shall seek pre-approval from the Company for any such expenses in excess of $100. Any and all expenses will be invoiced by BBT to the Company as soon as practicable and will be due upon receipt."

B. The following new Paragraphs numbered 22 and 23 are hereby added to the Agreement, which Paragraphs are to read in their entirety as follows:

"23. **Sublease.** BBT hereby subleases to the Company and the Company hereby assumes and accepts dominion and control over approximately 1,200 square feet of space plus common areas and the use of a conference room) at BBT's premises at 1810 Old Oakland Road, Suite F, San Jose, California 95131 (the "Subleased Premises"). The rent for the Subleased Premises shall be $3,000 per month commencing on May 1, 2004, and terminating on April 30, 2005.

24. **Employees.** Commencing May 1, 2004, the Company shall employ Tamio Saito, Tesuo Minato, Etsuko Lator, Eriko Fukadu and Tamae Ito as full time research and development and technology employees of the Company, and BBT hereby covenants and agrees to terminate its employment with such employees as of that date."

2. **Confirmation of the Agreement.** Except as herein modified, the Parties hereby reconfirm the validity and enforceability of the Agreement.

**IN WITNESS WHEREOF**, the Parties have caused this Amendment to be executed by the undersigned duly authorized respective officers, effective as of the day and year first set forth above.

BIG BANG TECHNOLOGIES, INC.


By: _____
    Tamio Saito, President


E-SMART TECHNOLOGIES, INC.


By: _____
    Mary A. Grace, President

PDD000151